UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
NOBLE RESOURCES PTE. LTD.,

                                Plaintiff,

     -against-

METINVEST HOLDING LTD. and
METINVEST INTERNATIONAL S.A.,

                                Defendants.
------------------------------------------------------------X

08 Civ. 11194 (PGG)


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO VACATE THE *EX PARTE* ORDER FOR PROCESS OF MARITIME ATTACHMENT


BROWN GAVALAS & FROMM LLP
Attorneys for Defendants
METINVEST HOLDING LTD. and
METINVEST INTERNATIONAL S.A.
355 Lexington Avenue
New York, New York 10017
Tel: (212) 983-8500
Fax: (212) 983-5946

*Of Counsel*:
PETER SKOUFALOS

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

RELEVANT FACTS ..............................................................................................3

    A. Metinvest Holding ....................................................................................3

    B. Metinvest International ..............................................................................3

    C. The Alleged Contract to Supply Coking Coal ..................................................5

ARGUMENT .......................................................................................................7

I.    Plaintiff Bears the Burden Under Rule E(4)(f) to Show
    Why the Attachment Should Not be Vacated ......................................................7

II.   Plaintiff Lacks a Valid Admiralty Claim, and
    This Court Therefore Lacks Admiralty Jurisdiction ..............................................9

    A. Noble's Claim for Breach of the Alleged Sale-of-Goods
       Contract Is Not an Admiralty Claim ...........................................................9

       1. The Alleged Contract to Purchase Coking Coal is not
          Purely or Wholly Maritime in Nature .....................................................10

       2. The Alleged Contract to Purchase Coking Coal is not a
          "Mixed" Contract with "Severable" Maritime Obligations,
          Nor are the Non-Maritime Components Merely
          Incidental to the Agreement ..................................................................14

       3. Noble's Claim under the Alleged Contract to Purchase
          Coking Coal Does Not Implicate the
          Purposes of Admiralty Jurisdiction .........................................................15

    B. Admiralty Jurisdiction Should Not Be Extended to Cover Claims
       Arising from Sale-of-Goods Contracts .......................................................16

III.  The Complaint Fails to Allege a Valid *Prima Facie*
    Maritime Claim against Metinvest International ...............................................18

IV.  In Any Event, Plaintiff's Claim is Unaccrued and
    Cannot Form a Basis for Rule B Attachment ..................................................19

CONCLUSION ..................................................................................................23

## TABLE OF AUTHORITIES

### Cases

*A/S J. Ludwig Mowinckles Rederi v. Tidewater Cons. Corp.,*
 559 F.2d 928 (4th Cir. 1977) ............................................................................ 20

*Aqua Stoli Shipping Ltd. v. Gardner Smith Pte. Ltd.,*
 460 F.3d 434 (2d Cir. 2006).................................................... 16, 17, 18, 20

*Armour & Co. v. Ft. Morgan Steamship Co.,*
 270 U.S. 253 (1926)......................................................................................... 11

*Aston Agro-Industrial AG v. Star Grain Ltd.,*
 06 Civ. 2805, 2006 U.S. Dist. LEXIS 91636 (S.D.N.Y. Dec. 20, 2006)................... 13

*Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l,*
 968 F.2d 196 (2d Cir. 1992).................................................... 10, 14, 15

*Bay Casino, LLC v. M/V ROYAL EMPRESS,*
 5 F. Supp. 2d 113 (E.D.N.Y. 1998) ............................................................ 8

*Bottiglieri di Navigazione SPA v. Tradeline LLC,*
 472 F. Supp. 2d 588 (S.D.N.Y. 2007).................................................... 20

*EFKO Food Ingredients Ltd. v. Pacific Inter-Link SDN BHD,*
 08 Civ. 6480, 2008 U.S. Dist. LEXIS 80861 (S.D.N.Y. Sept. 25, 2008) ........... 10, 12

*Eitzen Sealift A/S v. Cementos Andinos Dominicanos, SA,*
 05 Civ. 4550, 2005 U.S. Dist. LEXIS 19876 (S.D.N.Y. 2005) ........................ 8, 21

*Exxon Corp. v. Central Gulf Lines, Inc.,*
 500 U.S. 603 (1991)................................................................................... 9, 15

*Folksamerica Reinsurance Co. v. Clean Water of N.Y., Inc.,*
 413 F.3d 307 (2d Cir. 2005)............................................................................ 14

*Great Eastern Shipping Co., Ltd. v. Phoenix Shipping Corp.,*
 07 Civ. 8373, 2007 U.S. Dist. LEXIS 88911 (S.D.N.Y. Dec. 4, 2007)................... 17

*Greenwich Marine, Inc. v. SS Alexandra,*
 339 F.2d 901 (2d Cir. 1965)................................................................... 8, 20, 21

*Ins. Co. v. Dunham,*
 78 U.S. (11 Wall.) 1 (1871) ......................................................................... 15

*J. Manro v. Almeida,*
  23 U.S. (10 Wheat.) 473 (1825)................................................................................ 16

*Johnson Prods. Co. v. M/V La Molinera,*
  619 F. Supp. 764 (S.D.N.Y. 1985) .......................................................................... 11

*Luckenbach S.S. Co. v. Gano Moore Co.,*
  298 F. 343 (S.D.N.Y. 1923)...................................................................................... 11

*Lucky-Goldstar, Intl v. Phibro Energy Int'l,*
  958 F.2d 58 (5th Cir. 1992) ................................................................................ 12, 15

*Lunsford v. Farrell Shipping Lines, Inc.,*
  83 Civ. 7462, 1991 U.S. Dist. LEXIS 10263 (S.D.N.Y. July 26, 1991) .................. 11

*Mitsui Steamship Co., Ltd. v. Jarka Corp. of Philadelphia,*
  218 F. Supp. 424 (E.D. Pa. 1963) ........................................................................... 20

*Nehring v. Steamship M/V POINT VAIL,*
  901 F.2d 1044 (11th Cir. 1990) .............................................................................. 11

*Patricia Hayes & Assoc., Inc. v. Cammell Laird Holdings U.K.,*
  339 F.3d 76 (2d Cir. 2003).................................................................................... 20

*Precious Pearls, Ltd. v. Tiger Int'l Line Pte Ltd.,*
  07 Civ. 8325, 2008 U.S. Dist. LEXIS 58453 (S.D.N.Y. July 31, 2008) ................... 22

*Sea Transp. Contractors, Ltd. v. Indus. Chem. du Senegal,*
  411 F. Supp. 2d 386 (S.D.N.Y. 2006)........................................................................ 8

*Seatrans Shipping Corp. v. Interamericas Marine Transp. Ltd.,*
  93 Civ. 2329, 1997 U.S. Dist. LEXIS 5665 (S.D.N.Y. Apr. 29, 1997)..................... 21

*Shanghai Sinom Import and Export v. Exfin (India) Mineral Ore Co., Pvt. Ltd.,*
  2006 A.M.C. 2950 (S.D.N.Y. Oct. 5, 2006) ................................................... 12, 13, 18

*Sonito Shipping Co. Ltd. v. Sun United Maritime Ltd.,*
  478 F. Supp. 2d 532 (S.D.N.Y. 2007)....................................................................... 20

*Staronset Shipping, Ltd. v. North Star Navigation, Inc.,*
  659 F. Supp. 189 (S.D.N.Y. 1987) ........................................................................... 22

*Swiss Marine Servs. S.A. v. Louis Dreyfus Energy Servs. L.P.,*
  08 Civ. 7891, 2008 U.S. Dist. LEXIS 93095, (S.D.N.Y. Nov. 17, 2008) ................. 16

*T&O Shipping Ltd v. Lydia Mar Shipping Co.,*
    415 F.Supp.2d 310 (S.D.N.Y. 2006)................................................................ 21, 22

*Tangshan Schichenhui Iron & Steel Products Co. v. Lords Polymer (I) Pvt.,*
    08 Civ. 3576 (S.D.N.Y. May 20, 2008) ................................................... 13

*THE TOLEDO,*
    122 F.2d 255 (2d Cir. 1941).................................................................... 20

*Thypin Steel Co. v. Asoma Corp.,*
    215 F.3d 273 (2d Cir. 2000).................................................................... 11

*Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.,*
    109 F.3d 105 (2d Cir. 1997)............................................................ 9, 10, 14

*Ullises Shipping Corp. v. FAL Shipping Co. Ltd.,*
    415 F. Supp. 2d 318 (S.D.N.Y. 2006)........................................................ 8

*United States v. All Funds Distributed to Weiss,*
    345 F.3d 49 (2d Cir. 2003)...................................................................... 21

*United States v. Minker,*
    350 U.S. 179 (1956)................................................................................ 17

*Williamson v. Recovery L.P.,*
    542 F.3d 43 (2d Cir. 2008)...................................................................... 9

*Winter Storm Shipping Ltd. v. TPI,*
    310 F.3d 263 (2d Cir. 2002).............................................................. 16, 21

## Statutes

Fed. R. Civ. P. 12.......................................................................................... 1

Fed. R. Civ. P. Supp. Rule E................................................................ passim

## Other Authorities

BENEDICT ON ADMIRALTY (2005) ................................................................ 11

MOORE'S FEDERAL PRACTICE (1988)........................................................... 11

United Nations International Maritime Organization, International Shipping and the World Trade
    ................................................................................................ 16

Defendants Metinvest Holding Ltd. ("Metinvest Holding") and Metinvest International S.A. ("Metinvest International"), by their attorneys, Brown Gavalas & Fromm LLP, respectfully submit this memorandum of law in support of their motion, pursuant to Fed. R. Civ. P. Supp. Rule E(4)(f) and Fed. R. Civ. P. 12(b)(1), to vacate the *ex parte* Order for Process of Maritime Attachment signed by this Court on December 23, 2008 upon the application of plaintiff, Noble Resources Pte. Ltd. ("Plaintiff" or "Noble").

Also submitted in support of Defendants' motion to vacate and to dismiss the complaint are (i) the Declaration of Vladimir Gusak, head of the Coal and Coke Division of Metinvest Holding ("Gusak Decl."); (ii) the Declaration of Andrey Parkhomchuk, Managing Director of Metinvest International ("Parkhomchuk Decl."); and (iii) the Affidavit of Peter Skoufalos, Defendants' counsel in the present action ("Skoufalos Aff.").

## PRELIMINARY STATEMENT

This is not an admiralty case. The dispute between Noble and the Defendants[1] involves a disagreement as to whether a binding contract was formed for the sale and purchase of a quantity of coking coal and, if so, whether any such contract has been breached. In London arbitration, Noble seeks contract expectancy damages for what it contends is the Defendants' failure to purchase the cargo.

Noble, hanging its hat on the mere fact that the sale-of-goods contract contemplated shipment of the goods by one party or the other, seeks to invoke admiralty jurisdiction in order to obtain a result that would otherwise offend due process and basic fairness: subjecting a Ukrainian party and a Swiss party with no connection to the United States to jurisdiction here by attaching those parties' dollar-denominated funds as they are routed through New York banks on

---

[1] As is discussed below, the Verified Complaint coyly fails to identify with which of the two defendants Plaintiff allegedly concluded the sale contract.

their way to or from other foreign parties, all to provide pre-judgment security for a putative claim for money damages without any showing of likelihood of success or irreparable harm.

Whether or not this extraordinary relief would be warranted in a genuine admiralty case, this is not such a case. The fact that a sale-of-goods contract may contemplate shipment of the goods is not a proper basis to invoke admiralty jurisdiction.

Under the general rule applied in the Second Circuit, a breach of contract claim is not within admiralty jurisdiction unless the contract is "purely" or "wholly" maritime in nature. A contract providing for the sale of goods, which may incidentally contemplate that the goods will be shipped, does not meet this standard. The United States Supreme Court, the Second Circuit Court of Appeals, the U.S. District Court for the Southern District of New York, and numerous other courts, have all consistently held that a sale-of-goods does not become an "admiralty matter" merely because the contract obligates one party to ship the goods. Extending the bounds of admiralty jurisdiction, as Noble advocates, to cover sale-of-goods contracts that contemplate shipment of the goods, would open the door to a whole new class of cases and exponentially increase the number of maritime attachment applications in this already overburdened court.

The attachment should also be vacated because, at best, Noble has asserted a claim for indemnity without any evidence that such a cause of action has even accrued. Noble's claim is, therefore, entirely contingent and is not a *prima facie* admiralty claim for purposes of Rule B. Finally, the attached funds that are property of defendant Metinvest International must be immediately released since Noble has failed to allege any claim against that defendant.

## RELEVANT FACTS

### A. **Metinvest Holding** :

Metinvest Holding is a regional leader in the mining and steel industry in Ukraine and the Commonwealth of Independent States (CIS). Its operations involve the production and supply of steel, coke and iron ore. Metinvest Holding is not a maritime business. It does not own, lease, or operate marine vessels. Gusak Decl. ¶¶ 2-3.

Metinvest Holding's operations, properties, and assets are located primarily in Ukraine. Its registered office is located in Ukraine and its operations are headquartered mainly in Ukraine with the majority of its manufacturing facilities located in Ukraine. A portion of Metinvest Holding's business, however, is dollar-denominated, and for reasons beyond Metinvest Holding's control, dollar-denominated funds are routed through U.S. banks as they are passed between Metinvest Holding and its commercial counterparties. *Id.* ¶ 4.

Metinvest Holding denies that any contract was concluded with Noble for the sale and purchase of a quantity of coking coal. Consequently, Metinvest Holding "intends to defend itself vigorously in relation to jurisdiction, liability and damages in the appropriate forum." *Id.* ¶¶ 7-8.

Metinvest Holding was not a party to any contract for the leasing of a vessel to transport cargo. *Id.* ¶ 7.

### B. **Metinvest International:**

Metinvest International is a major trader of steel and metallurgical products. Its operations involve the sale of these products to buyers worldwide. Metinvest International is not a maritime business and it does not own, lease, or operate marine vessels. Parkhomchuk Decl. ¶¶ 2-3.

Metinvest International's operations, properties, and assets are mainly located in

Switzerland. Its registered office is located in Switzerland and its trading operations and traders are headquartered in Switzerland. Although Metinvest International has no presence in the United States, much of Metinvest International's business is dollar-denominated. For reasons beyond Metinvest International's control, dollar-denominated funds are routed through U.S. banks as they are passed between Metinvest International and its commercial counterparties. *Id.* ¶ 4.

Metinvest International disputes that any contract was concluded with Noble for the sale and purchase of a quantity of coking coal. Consequently, Metinvest International "intends to defend itself vigorously in relation to jurisdiction, liability and damages in the appropriate forum." *Id.* ¶¶ 5, 10-11.

To date, Noble has not presented any evidence of damages allegedly paid to any third party in connection with a charter contract. *Id.* ¶ 7. Metinvest International was not a party to any contract for the leasing of a vessel to transport cargo. *Id.* ¶ 8. The Complaint does not identify a particular vessel that was allegedly chartered by Noble.

All of the funds restrained by Noble pursuant to the Order of Attachment issued in this action are property of Metinvest International. On or about January 6, 2009, a wire transfer in the amount of $ 1 million originating from Metinvest International to AL EZZ Steel Rebars, Egypt was frozen as it was routed through Deutsche Bank Trust Company Americas, New York. On or about January 13, 2009, a second wire transfer in the amount of $ 1,695,923.83—this time with Metinvest International as beneficiary—was frozen as it was routed through J P Morgan Chase Bank N.A. in New York. *Id.* ¶ 9. *See* Skoufalos Aff. ¶ 6, Ex. "D".

The attachment obtained by Noble "is causing serious disruption and irreparable harm to Metinvest International's business, its relationships with its commercial counterparties, and its

4

financial standing with its banks." Parkhomchuk Decl. ¶ 12.

### C. The Alleged Contract to Supply Coking Coal:

In its Verified Complaint, Noble alleges that by "an unsigned contract dated June 23, 2008 and a signed trade confirmation dated June 30, 2008" Noble agreed to sell a quantity of coking coal "to the Defendant."[2] Compl. ¶ 5. Noble's verified complaint fails to append either the "unsigned contract" or the "signed trade confirmation." Compl., Skoufalos Aff. Ex. "A".

The Verified Complaint is devoid of any particular allegations relating to either defendant. The Complaint alleges only that Plaintiff entered into a contract with "the Defendant," without specifying which of the two defendants concluded the alleged contract with Plaintiff. The Verified Complaint then goes on to ignore that *two* defendants are referred to only as a single "Defendant."

The trade confirmation dated June 30, 2008 is appended to the Skoufalos Affidavit as Exhibit "B". On its face, it is addressed to Metinvest Holding. Metinvest International is not mentioned on the document. Both Defendants dispute that this document gave rise to a binding agreement and both Defendants deny that the London arbitrator has jurisdiction to hear Noble's claim against the Defendants. Gusak Decl. ¶¶ 7-8; Parkhomchuk Decl. ¶¶ 5, 10-11.

In any event, the trade confirmation is not an agreement for the charter of a vessel. It merely provides that a "SELLER" will sell a quantity of USA origin coking coal blend to a "BUYER" at a price of $355.00 per metric ton FOBT. The delivery term "FOBT" is shorthand for "free on board trimmed"—indicating that the "SELLER", Noble, has no obligation to transport the cargo. Noble does not explain how it can rely on a trade confirmation that does not contain any transportation obligations, while at the same time claiming indemnity for transportation related damages.

---

[2] The Verified Complaint fails to identify *which* Defendant was allegedly purchasing the coal.

The trade confirmation contains no choice-of-law or choice-of-forum provision. Nevertheless, the Verified Complaint alleges that "[t]he contract provided that any disputes arising thereunder shall be referred to London Arbitration with English law to apply." Compl. ¶ 11.

On or about December 8, 2008, by an email to Metinvest Holding, Noble's legal counsel appointed an arbitrator in London on allegations that a dispute had arisen under a trade confirmation dated June 30, 2008 for 70,000 metric tons USA-origin coking coal blend. The December 8, 2008 communication from Noble also states that "[w]e have agreed . . . to arbitration in London" despite the fact that the trade confirmation does not contain a London arbitration clause. Noble's email also purported to appoint Elizabeth I. Thomas of Hampshire, England as sole arbitrator. Skoufalos Aff. ¶ 8, Ex. "F".

On December 17, 2008, Metinvest Holding wrote to Noble's legal counsel, denying that a contract had been formed for "the purchase of coal." This correspondence also noted that the "Trade Confirmation relied upon contains no agreement to arbitrate (in London . . . or indeed elsewhere)." Finally, Metinvest Holding asked Noble to provide "copies of correspondence by which you purported to appoint" the London arbitrator. *Id.* ¶ 9, Ex. "G".

On the same day, December 17, Metinvest International also wrote to Noble's legal counsel, denying that a contract had been formed and confirming that "Metinvest International has not at any stage concluded any deal or legally binding contract with Noble." Metinvest Holding's December 17th letter also denied that Metinvest International could be compelled to arbitrate with Noble. *Id.* ¶ 10, Ex. "H".

In an effort to make its position known to the London arbitrator, Metinvest International wrote to Ms. Thomas on December 18, 2008 confirming that Metinvest International disputed

her jurisdiction. This correspondence also noted that Metinvest International "is not a party to the document relied upon (a Trade Confirmation dated 30 June 2008) and that document makes no provision for arbitration of disputes." Finally, Metinvest International's correspondence asks Ms. Thomas to clarify the basis of her appointment by Noble. *Id.* ¶ 11, Ex. "I".

On December 19, 2008, Ms. Thomas responded to Metinvest International and confirmed that the dispute had been submitted to her by Noble "under a Trade Confirmation dated 30 June 2008 for 70,000 metric tons USA Origin Mid Vol Coking Coal Blend *which included a clause referring all disputes to arbitration in London.*" *Id.* ¶ 12, Ex. "J" (*emphasis added*). To this date, and despite several requests, Noble has not provided to Defendants a copy of the communication sent to Ms. Thomas in which Noble purports to appoint her as sole arbitrator. Nor has Noble explained on what basis Ms. Thomas came to the erroneous belief that the June 30, 2008 Trade Confirmation (Skoufalos Aff. Ex. "B") contained a "clause" requiring London arbitration under English law.

## ARGUMENT

### POINT I

### PLAINTIFF BEARS THE BURDEN UNDER RULE E(4)(f) TO SHOW WHY THE ATTACHMENT SHOULD NOT BE VACATED

Once property is attached under Rule B, "a plaintiff shall be required to show why the . . . attachment should not be vacated or other relief granted consistent with these rules." Supp. Rule E(4)(f). At all times during the Rule E(4)(f) hearing, the burden remains on the plaintiff to show why the attachment should not be vacated.

Supplemental Rule E(4)(f) provides that "any person claiming an interest in [the attached property] shall be entitled to a prompt hearing at which the plaintiff shall be required to show

why the . . . attachment should not be vacated . . . ." At this post-attachment hearing, the defendant can attack the sufficiency of the "complaint, the arrest, the security demanded, or any other alleged deficiency in the proceedings." Supp. R. E(4)(f) Advisory Committee Note (1985 amendment). Plaintiff, as the party obtaining the attachment, "has the burden of showing that the attachment should not be vacated" at the hearing. *Seaplus Line Co. Ltd. v. Bulkhandling Handymax AS*, 409 F. Supp. 2d 316, 318 (S.D.N.Y. 2005); *Bay Casino, LLC v. MN ROYAL EMPRESS*, 5 F. Supp. 2d 113, 125 (E.D.N.Y. 1998); *Ullises Shipping Corp. v. FAL Shipping Co. Ltd.*, 415 F. Supp. 2d 318 (S.D.N.Y. 2006).

Moreover, a district court has discretion to review the relative equities of the parties in determining whether to uphold a maritime attachment. *Greenwich Marine, Inc. v. SS Alexandra*, 339 F.2d 901, 905 (2d Cir. 1965); *Eitzen Sealift A/S v. Cementos Andinos Dominicanos, SA*, 05 Civ. 4550, 2005 U.S. Dist. LEXIS 19876, at *6 (S.D.N.Y. 2005). Under this inherent power, a district court may vacate an attachment upon a showing of any improper practice or a manifest want of equity on the part of the plaintiff. *Sea Transp. Contractors, Ltd. v. Indus. Chem. du Senegal*, 411 F. Supp. 2d 386, 391 (S.D.N.Y. 2006).

The exercise of such discretion is particularly appropriate here where (i) the plaintiff has failed to disclose all material evidence to support its claim, including key contract documents; (ii) where Plaintiff has made misleading allegations in which it conflates the identity of the two Defendants through the sleight-of-hand of merely referring to them as a single "Defendant"; and (iii) where Plaintiff has withheld from Defendants the instructions Plaintiff sent to Ms. Thomas at the time Noble purported to appoint her as sole arbitrator.

## POINT II

### PLAINTIFF LACKS A VALID ADMIRALTY CLAIM, AND THIS COURT THEREFORE LACKS ADMIRALTY JURISDICTION

While no precise formula determines whether a contract is "maritime," courts look to the "subject matter of the . . . contract" and the "services performed under the contract." *Exxon Corp. v. Central Gulf Lines, Inc.,* 500 U.S. 603, 612 (1991). "The general rule is that admiralty jurisdiction arises only when the subject-matter of the contract is 'purely' or 'wholly maritime in nature.'" *Transatlantic Marine Claims Agency Inc. v. Ace Shipping Corp.,* 109 F.3d 105, 109 (2d Cir. 1997). The Verified Complaint in the present action, however, clearly fails to plead a *prima facie* "maritime" contract under any definition. The transaction alleged in the complaint relates exclusively to the sale and purchase of a quantity of coking coal. Extensive case law in this Circuit shows that disputes of this nature do not constitute an admiralty claim, even when ocean transportation of the cargo is contemplated.

### A. Noble's Claim for Alleged Breach of the Sale-of-Goods Contract Is Not an Admiralty Claim

To properly invoke admiralty jurisdiction to sustain the Order of Attachment, Noble must establish that its claim for breach of the alleged contract to purchase coking coal is a valid admiralty contract claim. *See Williamson v. Recovery L.P.,* 542 F.3d 43, 48 (2d Cir. 2008) ("because prejudgment attachment is such a severe remedy, it is important to first determine whether a contract is, in fact, a maritime contract warranting maritime attachment"); *Transatlantic,* 109 F.3d at 109 ("[w]hen assessing admiralty contract jurisdiction, the nature and subject matter of the contract at issue is the crucial consideration") (internal quotations omitted). *See also Exxon Corp.,* 500 U.S. at 612 (courts "look to the subject matter of the [] contract" to "determine whether the services performed under the contract are maritime in nature.").

In the Second Circuit, "[t]he general rule is that admiralty jurisdiction arises only when the subject matter of the contract is 'purely' or 'wholly' maritime in nature." *Transatlantic,* 109 F.3d at 109; *accord Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l,* 968 F.2d 196, 199 (2d Cir. 1992) ("a contract will not sustain admiralty jurisdiction unless the contract is wholly maritime in nature"). "A 'mixed' contract, i.e., a contract that contains both admiralty and non-admiralty obligations is, therefore, usually not within admiralty jurisdiction." *Transatlantic,* 109 F.3d at 109; *accord Atlantic Mut.,* 968 F.2d at 199 ("where a contract contains both maritime and non-maritime obligations, admiralty jurisdiction is generally denied").

**1.    The Alleged Contract to Purchase Coking Coal is not Purely or Wholly Maritime in Nature:**

The alleged contract to purchase coking coal, which is a straightforward contract for the sale of goods, is not purely or wholly maritime in nature.  The principal obligations under the trade confirmation are for Metinvest Holding to buy, and for Noble to sell, 70,000 metric tons of Mid Vol Coking Coal Blend, delivery basis FOBT.  Thus, insofar as Noble's claim relies on this alleged contract, there is no maritime element upon which to base admiralty jurisdiction.

Even if the alleged contract obliged Noble to ship the goods, the sale-of-goods contract is not transformed into a wholly or purely maritime contract.  "Admiralty jurisdiction does not attach to a contract merely because the services to be performed under the contract have reference to a ship or to its business, or because the ship is the object of such services." *EFKO Food Ingredients Ltd. v. Pacific Inter-Link SDN BHD,* No. 08 Civ. 6480, 2008 U.S. Dist. LEXIS 80861, at *4 (S.D.N.Y. Sept. 25, 2008) (McMahon, J.).  Instead, "[i]n order to be considered maritime, there must be a ***direct and substantial link*** between the contract and the operation of the ship, its navigation, or its management afloat, taking into account the needs of the shipping industry, for the very basis of the constitutional grant of admiralty jurisdiction was to ensure a

national uniformity of approach to world shipping." *Id.* (quoting 1 BENEDICT ON ADMIRALTY §

182 (2005)) (emphasis in original). *See also, e.g., Nehring v. Steamship M/V POINT VAIL*, 901

F.2d 1044, 1048 (11th Cir. 1990) ("Not every contract that somehow relates to a ship or its

business is considered maritime.  To come within the federal court's admiralty and maritime

jurisdiction, 'such contracts must pertain directly to and be necessary for commerce or

navigation upon navigable waters.") (quoting 7A MOORE'S FEDERAL PRACTICE ¶ 230[2] at 2761

(1988))

    Courts generally hold that a non-maritime contract that contemplates some further

maritime component, such as a requirement in a non-maritime contract that one party enter a

separate agreement with a third party to hire a ship, does not render original contract maritime.

*See, e.g., Thypin Steel Co. v. Asoma Corp.*, 215 F.3d 273, 278 (2d Cir. 2000); *Johnson Prods.*

*Co. v. M/V LA MOLINERA*, 619 F. Supp. 764, 767 (S.D.N.Y. 1985) ("forwarding of a bill of

lading does not in itself create a maritime contract"); *Lunsford v. Farrell Shipping Lines, Inc.*, 83

Civ. 7462, 1991 U.S. Dist. LEXIS 10263, at *5 (S.D.N.Y. July 26, 1991).

    More specifically, it has long been established that a sale-of-goods contract, like the

alleged coking coal sale agreement here, does not become a "maritime" contract merely because

it obligates one party or the other to ship the goods. *See, e.g., Armour & Co. v. Ft. Morgan*

*Steamship Co.*, 270 U.S. 253, 259 (1926) ("[t]he original contract to purchase, assemble, and sell

the cattle, to charter vessels and therein transport the cattle to Jacksonville. . . are not maritime

contracts"); *Luckenbach S.S. Co. v. Gano Moore Co.*, 298 F. 343, 344 (S.D.N.Y. 1923) (L. Hand,

J.), *rev'd in part on other grounds*, 298 F. 344 (2d Cir. 1924) ("Nor is it possible to treat a

contract of sale as maritime even though its performance involves the carriage of the goods on

the seas to the place of delivery"); *Lucky-Goldstar, Intl v. Phibro Energy Int'l*, 958 F.2d 58, 59

(5th Cir. 1992) ("[i]t is well established that such a sale of goods by itself would not be 'maritime' merely because the seller agrees to ship the goods by sea to the buyer.").

Several recent cases in the Southern District, each involving facts analogous to those presented here, confirm that a sale-of-goods contract containing an obligation for one party to ship the goods, is not a maritime contract and cannot support the exercise of admiralty jurisdiction or maintenance of a maritime attachment order. In *EFKO,* for example, Judge McMahon vacated an *ex parte* maritime attachment order which he had entered in connection with the plaintiff's claim that the defendant had breached contracts to sell palm olein to plaintiff. 2008 U.S. Dist. LEXIS 80861. Judge McMahon held that the contracts were not maritime:

> Here, the subject matter of the contracts is the sale and purchase of a quantity of palm olein. Neither palm olein nor the sale thereof is directly or intimately related to the operation of a vessel or its navigation. It has been widely held that a commodity sale and purchase contract — even if the contract requires maritime transport relating to the shipment of the commodity — is not maritime in nature.

*Id.* at \*4 (emphasis added). Responding specifically to plaintiff's argument that "the contract and its claims for breach are maritime in nature because the defendant was required to charter ships to pack up and deliver the palm olein, and defendant breached that aspect of the agreement," Judge McMahon stated that "[t]his is bootstrapping of the most egregious sort. Defendant's responsibility to arrange for shipment is only incidental to the sale and purchase contract as a whole." *Id.* at \*5.

Similarly, in *Shanghai Sinom Import and Export v. Exfin (India) Mineral Ore Co., Pvt. Ltd.,* 2006 A.M.C. 2950 (S.D.N.Y. Oct. 5, 2006), Judge Lynch vacated an *ex parte* maritime attachment order which he signed in connection with the plaintiff's claim that defendant had breached contracts to sell iron ore to plaintiff. Although the contract contemplated that

defendant would be obligated to ship the goods and would enter a separate contract with a suitable ship owner to meet that obligation, Judge Lynch held that the contract was not maritime. *Id.* at 2951 ("[o]n this record, both common sense and long-established case law suggest that this is a non-maritime dispute between a purchaser and seller over the alleged failure to deliver purchased goods").

In another similar case, *Aston Agro-Industrial AG v. Star Grain Ltd.,* 06 Civ. 2805, 2006 U.S. Dist. LEXIS 91636 (S.D.N.Y. Dec. 20, 2006), Judge Daniels vacated the *ex parte* maritime attachment order that he signed in connection with the plaintiff's claim that defendant had breached contracts to purchase wheat from plaintiff. Although the plaintiff was obliged to ship the wheat to plaintiff and entered into separate charter party contracts to accomplish that shipment, Judge Daniels held that the contract between plaintiff and defendant was not a maritime contract:

> In this case the contracts are not maritime contracts because their primary objective was not the transportation of goods by sea. Instead, their primary objective was, undoubtedly, the sale of wheat. That the wheat was transported on a ship does not make the contracts maritime contracts any more than it would make them aviation contracts had the wheat been shipped via airplane.

*Id.* at *3.

In *Tangshan Schichenhui Iron & Steel Products Co. v. Lords Polymer (I) Pvt.,* 08 Civ. 3576 (S.D.N.Y. May 20, 2008), Judge Crotty vacated a maritime attachment order in a case involving a claim for breach of a contract to buy and sell iron ore. Notwithstanding references in the contract to shipment of the goods by vessel, Judge Crotty held that the dispute was not "cognizable under the Court's admiralty and maritime jurisdiction."

2.    **The Alleged Contract to Purchase Coking Coal is Not a "Mixed" Contract with "Severable" Maritime Obligations, Nor are the Non-Maritime Components Merely Incidental to the Agreement:**

There are only two exceptions to the general rule that a contract must by wholly maritime in nature to invoke admiralty jurisdiction and that "mixed" contracts generally are not within admiralty jurisdiction: if the non-maritime elements of a "mixed" contract are (i) severable from the maritime obligations or (ii) merely incidental to the maritime obligations. *Transatlantic,* 109 F.3d at 109; *Atlantic Mut.,* 968 F.2d at 199; *see also Folksamerica Reinsurance Co. v. Clean Water of N.Y., Inc.,* 413 F.3d 307, 314 (2d Cir. 2005).

Even if the alleged contract to purchase coking coal is considered a "mixed" contract, neither exception applies here. The obvious principal purpose of the contract is non-maritime: purchase and sale of coking coal. The only arguably "maritime" element of the alleged contract is the putative Seller's obligation to deliver the cargo at the port of loading to a vessel to be supplied by the Buyer.[3] In any event, it is obvious that this alleged element concerning transport of the goods cannot be severed from the primary obligations set out in the trade confirmation on which Noble relies—Noble to sell and Metinvest Holding to buy the coking coal. *See Atlantic Mut.,* 968 F.2d *at* 199 (noting that the first exception focuses on whether "maritime obligations can be separately enforced without prejudice to the rest of the contract"). The alleged obligation concerning transport of the goods cannot be enforced separately from, and without prejudice to, the obligations to buy and sell the underlying commodity.

In fact, the alleged elements concerning transport of the coking coal are incidental to the primary, non-maritime substance of the alleged contract. *See Luckenbach,* 298 F. 343 *at* 344 ("In such matters, the whole contract must be maritime in its character, and, when the performance is

---

[3] The FOBT term of the Trade Confirmation indicates that the Seller is not responsible for the ocean transport of the cargo. Without an obligation to transport the cargo, Noble's claim is even more attenuated from genuine maritime commerce.

partly maritime and partly terrene, a court of admiralty will not assume jurisdiction over it, unless the non-maritime features be inconsiderable."). In *Lucky-Goldstar*, the court held that a land-based contract for sale of toluene was not a maritime contract even if the seller required the buyer to ship the goods because the agreement to sell the toluene was not "incidental" to the agreement to deliver. 958 F.2d *at* 59-60. The court explained that "[t]his case does not present a chicken and egg puzzle" because "delivery was not necessary to a sale and the buyer took title as the product crossed the ship flange at the load port." *Id.* at 60.

### 3. Noble's Claim Under The Alleged Contract to Purchase Coking Coal Does Not Implicate the Purposes of Admiralty Jurisdiction

The purposes for admiralty jurisdiction do not support extending such jurisdiction over Noble's claim for breach of the alleged contract to purchase coking coal. *See Exxon,* 500 U.S. at 608 ("[i]n determining the boundaries of admiralty jurisdiction we look to the purpose of the grant"). Admiralty jurisdiction "was created to provide a neutral federal forum and a uniform body of law to adjudicate rights and liabilities as they related to the trafficking of seafaring vessels." *Atlantic Mut.,* 968 F.2d at 199-200 (citing *Ins. Co. v. Dunham,* 78 U.S. (11 Wall.) 1, 13 (1871); 1 BENEDICT ON ADMIRALTY § 182). In this case, none of these purposes will be advanced.

The forum for deciding the underlying issues will depend upon whether there is a binding contract in existence and, if so, what terms have been agreed pursuant to that contract, which will be decided in the first instance in London arbitration. Whatever the finding of that arbitration, this Court will serve only to attach assets. Admiralty jurisdiction generally, and maritime attachment orders in particular, developed historically also for the purpose of capturing the "transient" assets of "peripatetic" seafaring parties that otherwise might not be practically recoverable. *See Aqua Stoli Shipping Ltd. v. Gardner Smith Pte. Ltd.,* 460 F.3d 434, 443 (2d Cir.

2006); *see also J. Manro v. Almeida,* 23 U.S. (10 Wheat.) 473, 491-2 (1825) (purpose of maritime attachments is "to obtain an appearance" in situations where "a defendant has concealed himself, or has absconded from the kingdom, so that he cannot be arrested"). No such concerns are implicated here.

### B. Admiralty Jurisdiction Should Not Be Extended to Cover Claims Arising from Sale-of-Goods Contracts

We are aware of no case in which a federal court has exercised admiralty jurisdiction based on a sale-of-goods contract merely because the contract contemplated shipment of the goods. This Court should not be the first to extend the boundaries of admiralty jurisdiction in this manner for at least three reasons:

First, maritime shipping is the mode of conveyance for a great percentage of the world's traded goods. *See United Nations International Maritime Organization, International Shipping and the World Trade* at 7 (November 2008) (http://www.imo.org). Thus, the potential volume of cases that would flood the federal courts if admiralty jurisdiction could be invoked as to any actions involving breach of contracts to sell shipped goods, wherever such contracts are entered anywhere in the world, is staggering.

Second, expanding admiralty jurisdiction to reach cases of this type risks disruption to financial markets because attaching electronic funds transfers introduces a measure of uncertainty into the financial system. Since the Second Circuit decision permitting maritime attachments of U.S. dollars as they are notionally routed from one foreign bank to another, *Winter Storm Shipping,* 310 F.3d at 278, federal courts are already inundated with applications for maritime attachments in genuine admiralty disputes. *See Swiss Marine Servs. S.A. v. Louis Dreyfus Energy Servs. L.P.,* 08 Civ. 7891, 2008 U.S. Dist. LEXIS 93095, at *1 n.1 (S.D.N.Y. Nov. 17, 2008) (Sand, J.) (noting that the "surge in the number of maritime attachment cases"

after *Winter Storm* "may be considered the flood after the Storm"); *see also Aqua Stoli,* 460 F.3d

at 445, n.6 (noting that courts have criticized *Winter Storm* as unfair to parties with no

connection to the United States save for their transacting in dollars, that banking entities have

criticized the case as disruptive to financial markets"). This situation will be dramatically

exacerbated if admiralty jurisdiction is extended to cover all contracts involving sales of shipped

goods anywhere in the world.

Third, an *ex parte* marine attachment order is an extraordinary remedy, and courts should

be cautious about expanding the volume of cases and parties as to which it can be applied. *See*

*Great Eastern Shipping Co., Ltd. v. Phoenix Shipping Corp.,* 07 Civ. 8373, 2007 U.S. Dist.

LEXIS 88911 (S.D.N.Y. Dec. 4, 2007) ("[E]x parte proceedings, 'untrammelled by the

safeguards of a public adversary judicial proceeding, afford too ready opportunities for unhappy

consequences to prospective defendants.") (quoting *United States v. Minker,* 350 U.S. 179, 188

(1956)).

As Judge Lynch observed in vacating an *ex parte* maritime attachment order in the

*Shanghai Sinom* case, admiralty jurisdiction should not be extended to cover contracts that

provide for purchase of goods "with a proviso that the goods be sent by sea, and with some

incidental provisions bearing on the nature of that shipment":

> In recent years maritime attachments in this District in particular,
> and distinct from just about everywhere else in the United States,
> have become a rather prominent heading of our jurisdiction. . . .
> Were such efforts [to expand admiralty jurisdiction to cover sale-
> of-goods contracts contemplating shipment of the goods] to be
> countenanced, we would have in effect the kind of perfect storm. . .
> in which the combination of expansive interpretation of maritime
> attachments and expansive interpretation of admiralty jurisdiction
> would mean that just about any international dispute in any sort of
> commercial context all over the world, wherever anything comes
> close to a boat, would result in the potential for filing attachments
> in this District. Now that would be great news for the New York

bar. . . but it would be less good news for this court and less good news for the banks that would have to administer these attachments, and ultimately less good news for orderly resolution of disputes around the world.

2006 A.M.C. at 2952-53.

## POINT III

### THE COMPLAINT FAILS TO ALLEGE A VALID *PRIMA FACIE* MARITIME CLAIM AGAINST METINVEST INTERNATIONAL

The first prong of the Second Circuit's test in *Aqua Stoli* requires the plaintiff to show that it has a "valid *prima facie* admiralty claim" against the defendant before the district court may issue an order of maritime attachment. 460 F.3d at 445 (2d Cir. 2006). While the Court may not rule on the merits of the underlying dispute at a Rule E(4)(f) hearing, the Second Circuit's decision in *Williamson* affirms the district court's ability to review evidence beyond the four-corners of the verified complaint to determine whether a maritime claim exists in the first place: "[t]he evidence provided to the district court is 'insufficient at this stage to demonstrate that Plaintiffs have the requisite prima facie admiralty claim against any defendants.'" *Williamson*, 542 F.3d at 53.

As noted in the Parkhomchuck Declaration, two electronic funds transfers (EFT) in which Metinvest International was either the originator or beneficiary were restrained pursuant to the Order of Attachment in this case. Parkhomchuck Decl. ¶ 9; Skoufalos Aff. ¶ 6, Ex. "D". These two EFT's total $2,695,923.83—the full amount sought by Noble. These funds should be immediately released, as Noble has failed to allege any claim against Metinvest International.

The Verified Complaint fails to identify Noble's alleged counterparty in the sale-of-goods contract which is the subject of the complaint. The complaint merely alleges that Noble agree to sell a cargo of coking coal "to the Defendant." The use of the singular "Defendant" is

used throughout the Complaint.

It is indisputable that the Verified Complaint fails to satisfy the pleading requirements of Supplemental Rule E(2)(a). That rule requires that "the complaint shall state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." Supp. Rule E(2)(a). The allegations of the Complaint are simply insufficient in terms of providing any notice to Metinvest International of the basis of its purported liability to Noble.

Furthermore, it is clear that Noble is relying on the June 30, 2008 "Trade Confirmation" as the basis for asserting it concluded a contract for the sale and purchase of the coking coal. In fact, the sole arbitrator Noble purported to appoint has confirmed that Noble instructed her pursuant to the June 30, 2008 trade confirmation. If that is the case, Noble cannot fairly state any claim (let alone a maritime claim) against Metinvest International because Metinvest International is not even named in the trade confirmation. *See* Skoufalos Aff. Ex."B".[4]

In the absence of a valid *prima facie* maritime claim against Metinvest International, the attachment must vacated and all property of Metinvest International released immediately.

## POINT IV

### IN ANY EVENT, PLAINTIFF'S CLAIM IS UNACCRUED AND CANNOT FORM A BASIS FOR RULE B ATTACHMENT

Noble commenced this action in order to obtain indemnification from the Defendants, even though Noble itself has not alleged that it paid any contractual damages or received a demand for security from the shipowner. Therefore, Noble's indemnity claim is unaccrued and

---

[4] This point, of course, was also made directly to Noble by Metinvest. *See* Metinvest International correspondence to Noble dated December 17, 2008, Skoufalos Aff. ¶ 10, Ex. "H"; *see also* Parkhomchuk Decl. ¶ 10.

cannot support a claim for maritime attachment.

It is trite law that an accrued claim is a prerequisite for a "valid prima facie admiralty claim" under *Aqua Stoli*. *See Bottiglieri di Navigazione SPA v. Tradeline LLC*, 472 F. Supp. 2d 588 (S.D.N.Y. 2007) (finding that plaintiff failed to establish a valid prima facie admiralty claim because its "claim for indemnity is not ripe under English law"); *see also Sonito Shipping Co. Ltd. v. Sun United Maritime Ltd.*, 478 F. Supp. 2d 532, 540 (S.D.N.Y. 2007) (noting that "courts in this circuit have not been receptive to contingent indemnity claims as bases for maritime arrests for attachments").

The Verified Complaint fails to offer any proof that plaintiff actually incurred any direct losses in the underlying claims for which indemnity is sought. In such circumstances, the remedy of a maritime attachment is not available to the plaintiff.

It is well-settled federal jurisprudence that a cause of action for indemnity cannot be brought before the underlying claim has been properly settled, compromised, or paid. *Greenwich Marine*, 339 F.2d 901; *THE TOLEDO*, 122 F.2d 255, 257 (2d Cir. 1941), *cert. denied*, 314 U.S. 689 (1941); *Patricia Hayes & Assoc., Inc. v. Cammell Laird Holdings U.K.*, 339 F.3d 76, 82 (2d Cir. 2003); *A/S J. Ludwig Mowinckles Rederi v. Tidewater Cons. Corp.*, 559 F.2d 928 (4th Cir. 1977); *Mitsui Steamship Co., Ltd. v. Jarka Corp. of Philadelphia*, 218 F. Supp. 424, 425 (E.D. Pa. 1963). As important, the Second Circuit stated in *Greenwich Marine* that, "[t]he prematurity objection has been ignored only on isolated situations under peculiar factual circumstances." 339 F.3d at 905.

Where a party asserts a cause of action for indemnity before the underlying liability is determined or payment made to a third party, the court has discretion to determine whether an attachment should be vacated because an indemnity action is premature. *Seatrans Shipping Corp.*

*v. Interamericas Marine Transp. Ltd.,* 93 Civ. 2329, 1997 U.S. Dist. LEXIS 5665, *3 (S.D.N.Y. Apr. 29, 1997); *see also Eitzen Sealift,* 2005 U.S. Dist. LEXIS 19876. In general, the seizure of funds where the claim is still premature should be disallowed except "in isolated situations under peculiar factual circumstances." *United States v. All Funds Distributed to Weiss,* 345 F.3d 49, 58 (2d Cir. 2003) (*cited by Winter Storm Shipping Ltd. v. TPI,* 310 F.3d 263, 276-77 (2d Cir. 2002); *quoting Greenwich Marine,* 339 F.2d at 906-07).

*T&O Shipping Ltd v. Lydia Mar Shipping Co.,* 415 F.Supp.2d 310 (S.D.N.Y. 2006) is on point. There, charterer obtained a writ of attachment against vessel owner on the ground of "indemnity for potential future third party cargo claims" stemming from a grounding off the coast of South Africa. Subsequently, the charterer attached over $600,000 of shipowner's funds. Importantly, it was undisputed, as it is here, that charterer had not made any payments whatsoever to third parties resulting from the casualty. The vessel owner moved to vacate the attachment on the basis that, under English law, the charterer's claims were not ripe since "none of the claims against T&O have been concluded by a court order, arbitral proceeding, settlement or otherwise." 415 F. Supp. 2d at 316. The court held that charterer had not demonstrated that it possessed a maritime claim against vessel owner:

> [Charterer] has not made a prima facie showing that it has a maritime claim against [owner] for indemnity. Cargo claims *have been filed* against [charterer] but *they have yet to be resolved. If [charterer] had paid claims and was in the process of actually seeking indemnity* from [owner], the need for security would be clear. While it seems likely that an indemnity claim cannot be brought before the underlying claim is "properly settled or compromised or paid," the issue of whether the Charter Party *requires* an accrued cause of action before [charterer] may bring an indemnity claim remains in dispute. *This is a substantive legal question which will be decided under English law in the arbitration and is not a question that this court should or will resolve.* Accordingly, the attachment should be vacated until that question is decided and/or the claims have clearly accrued.

21

415 F. Supp. 2d at 316 (italics in original).

Here, Noble has failed to adduce "peculiar" facts that would permit this Court, in its discretion, to uphold Plaintiff's maritime attachment. Crucially, Plaintiff does not allege that it posted security for any alleged claim by the vessel owners. *Staronset Shipping, Ltd. v. North Star Navigation, Inc.*, 659 F. Supp. 189 (S.D.N.Y. 1987); *Daeshin Shipping Co., Ltd. v. Meridian Bulk Carriers, Ltd.*, 05 Civ. 7173, 2005 U.S. Dist. LEXIS 22409 (S.D.N.Y. Oct. 3, 2005).

In order to assert a claim for indemnity, Plaintiff must allege that it has paid or settled the underlying claim, or that the ultimate claim-holder has demanded security or commenced legal proceedings. *See Precious Pearls, Ltd. v. Tiger Int'l Line Pte Ltd.*, 07 Civ. 8325, 2008 U.S. Dist. LEXIS 58453, at *6 (S.D.N.Y. July 31, 2008) (finding contingent indemnity claim unaccrued because "the plaintiff has not alleged that it has paid or settled the cargo damage claim or that the cargo receivers have demanded security from the plaintiff or initiated any legal proceedings against the plaintiff."). In this case, there is no evidence before this Court that Noble has been adjudged liable to the vessel owner. There is no evidence that Noble has paid any claims in settlement to the vessel owner. There is no evidence that Noble has furnished any security to the vessel owners. Under these facts, Noble's indemnity claim against Defendants is premature and no "peculiar factual circumstances" exist to ignore the well-settled "prematurity objection." The balance of equities in this case tips decisively in Defendants' favor.

Noble only alleges that the Defendants' alleged breach caused it to "sustain[] damages in the total principal amount of $2,150,000.00 which represents deadfreight due and owing to Oldendorff as a result of the cancellation of the charter party." Compl. ¶ 10. Noble does not allege that it paid the deadfreight, or that a formal request for such payment has been made.

Finally, the Trading Confirmation annexed as Exhibit "B" to the Skoufalos Affidavit

entirely undermines the allegations of the complaint as they relate to liability under a charter

agreement. The trading confirmation is on FOBT terms—indicating that Noble, as Seller, had no

transportation obligations. Because Noble itself is relying on the trade confirmation to establish

the existence of an alleged contract, it should be required to prove its basis for claiming

transportation-related costs from Defendants. Put simply, the trading confirmation does not

require Noble to incur transportation expenses, and any claim to recover such expenses from

Defendants is inherently specious.

Accordingly, Noble has failed to state a valid *prima facie* claim for indemnification

against Defendants and the attachment must, therefore, be vacated.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the *ex parte* Order for

Process of Maritime Attachment be vacated; that all amounts attached by Noble to date be

release immediately; and that the Verified Complaint be dismissed for lack of subject matter

jurisdiction.

Dated: New York, New York
       February 25, 2009

Respectfully submitted,

BROWN GAVALAS & FROMM LLP
Attorneys for Defendants
METINVEST HOLDING LLC and
METINVEST INTERNATIONAL S.A.

By: _____

Peter Skoufalos (PS-0105)
355 Lexington Avenue
New York, New York 10017
Tel: (212) 983-8500
Fax: (212) 983-5946