UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NOBLE RESOURCES PTE. LTD.,

                     Plaintiff,

    -against-

METINVEST HOLDING LTD. and
METINVEST INTERNATIONAL S.A.,

             Defendants.

08 Civ. 11194 (PGG)

**MEMORANDUM
OPINION AND ORDER**

PAUL G. GARDEPHE, U.S.D.J.:

        In this maritime attachment action, Plaintiff Noble Resources Pte. Ltd. ("Noble") alleges that it entered into a contract with Defendants Metinvest Holding Ltd. and Metinvest International S.A. to sell, transport by chartered vessel, and deliver a cargo of coking coal to Defendants.  Noble further claims that Defendants repudiated the contract before the coal was shipped, and that as a result Noble was forced to cancel a charter party agreement it had entered into in which it had arranged for transport of the coal.  Noble claims that it has suffered damages of $2.15 million, representing "deadfreight due and owing to [the vessel's owner] as a result of the cancellation of the charter party."[1]  (Complaint, Skoufalos Aff., Ex. A, ¶¶ 5-10)

        On December 23, 2008, Noble filed a verified complaint and supporting attorney affidavit seeking a Rule B Order attaching "all tangible or intangible property belonging to, claimed by, or being held for the Defendants by any garnishees within this District up to

---

[1]  "Deadfreight" is a charge payable by a charterer or shipper to the ship owner where the charterer or shipper has booked space on a ship but has not utilized it.  See Black's Law Dictionary 691 (8th ed. 2004)

$2,695,923.83."[2]  (Ex Parte Attachment Order, Skoufalos Aff., Ex. C)  Pursuant to an ex parte

Rule B attachment order issued by this Court on December 23, 2008, Deutsche Bank restrained

$1 million of Defendant Metinvest International's funds on January 5, 2009, and JPMorgan

Chase Manhattan Bank restrained $1,695,923.83 of Metinvest International's funds on January

6, 2009.  (Skoufalos Aff., Ex. D)

On February 25, 2009, Defendants moved to vacate the attachment order pursuant

to Fed. R. Civ. P. 12(b)(1), Rule E(4)(f) of the Supplemental Rules for Certain Admiralty and

Maritime Claims of the Federal Rules of Civil Procedure, and Local Admiralty Rule E.1.

Defendants argue that this Court lacks subject matter jurisdiction because Plaintiff's claim arises

from non-maritime contractual obligations.

On March 11, 2009, this Court held a hearing on Defendant's motion to vacate.

For the reasons stated below, Defendants' motion is GRANTED and this Court's December 23,

2008 order for Process of Maritime Attachment and Garnishment (the "Rule B Order") is

VACATED.

## BACKGROUND

This Court's December 23, 2008 order of attachment was issued on the basis of a

Verified Complaint containing, inter alia, the following allegations:

> 5.  By an unsigned contract dated June 23, 2008 and a signed trade
> confirmation dated June 30, 2008, Plaintiff agreed to sell and deliver
> by ocean transport a cargo of Coking Coal to the Defendant.[3]

---

[2]  In addition to the deadfreight damages, Plaintiff sought to obtain security for $295,923.83 in interest and $250,000 in attorneys' fees and costs which it expects to incur in connection with a London arbitration of the underlying dispute between the parties.

[3]  Plaintiff asserts that "[t]he reference to a single 'Defendant' in the Verified Complaint is a typographical error and everywhere 'Defendant' is used, the plural 'Defendants' was intended." (Davies Decl. ¶ 9)

6. Pursuant to the terms of the contract, the Plaintiff was required to charter a Vessel for the carriage of the cargo from the loadport in Virginia to the Defendant's nominated discharge port.

7. Pursuant to the contract, Plaintiff nominated and chartered the Vessel "OLDENDORFF TBN" (hereinafter, the "Vessel") from her owners, Oldendorff GmbH & Co. KG. ("Oldendorff"), for the carriage of the cargo of Coking Coal from Virginia by a charter party dated September 2, 2008.

8. In breach of the terms of the contract, the Defendant claimed they could no longer ship the cargo.[4]

9. As a result of the Defendant's default, Plaintiff was forced to cancel the charter party with Oldendorff.

10. As a result, Plaintiff has sustained damages in the total principal amount of $2,150,000 which represents deadfreight due and owing to Oldendorff as a result of the cancellation of the charter party. This principal amount is exclusive of interest, arbitration costs and attorney's fees.

11. The contract provided that any disputes arising thereunder shall be referred to London Arbitration with English law to apply.

12. Plaintiff has commenced arbitration in London pursuant to the contract and appointed its arbitrator.

(Complaint, Skoufalos Aff., Ex. A, ¶¶ 5-12.) The unsigned contract dated June 23, 2008 and the signed trade confirmation dated June 30, 2008 – which the Verified Complaint referred to collectively as "the contract" (id., ¶¶ 6-8, 11-13) – were not provided to the Court.

After this Court issued the attachment order, Defendants moved to vacate, and submitted to the Court the June 30, 2008 signed trade confirmation cited by Plaintiff in paragraph 5 of the Verified Complaint. (Skoufalos Aff., Ex. B) The trade confirmation had been

---

[4]  At the March 11, 2009 hearing, Plaintiff's counsel clarified that the phrase "could no longer ship the cargo" (Cmplt. ¶ 8) was intended merely to communicate that Defendants "repudiated the sales contract" concerning the coking coal. (Transcript of Mar. 11, 2009 hearing ("Mar. 11 Tr.") at 7)

3

signed by a representative of Metinvest Holding.  Metinvest International – the entity whose

funds have been attached – was not mentioned in the document.  The trade confirmation deals

only with the sale of coal by Plaintiff to Metinvest Holding.  The price listed is "US$355.00/MT

[Metric Ton] FOBT loaded vessel at Lambert's Point, Norfolk, USA."  (Id.)  The reference to

"FOBT" – an abbreviation for "free on board trimmed" – indicates that Plaintiff had no

obligation to transport the coal.  The trade confirmation likewise makes no mention of the

supposed agreement to arbitrate disputes in London. [5]  (Id.)

        In opposing Defendants' motion to vacate, Plaintiff for the first time alleged that

the parties' obligations are governed not by the alleged June 2008 trade confirmation and

unsigned contract cited in the Verified Complaint, but instead by a "September 8, 2008

[unsigned] contract [that] is the result of further negotiations between the parties subsequent to

the June 23, 2008 contract and the trade confirmation dated June 30, 2008."  (Pltf. Br. 7; Mar. 11

Tr. 9).  The unsigned September 8, 2008 contract provides for Plaintiff's sale of 70,000 metric

tons of coal to Metinvest International.  (Davies Decl., Ex. 2).  In contrast to the June 2008

documents, the September 8 agreement provides that Plaintiff "shall deliver the goods to the

buyer on CIF [cost, insurance, freight] FO basis."[6]  (Id., ¶ 9.1)  The September 8, 2008

---

[5]  Neither side has submitted the "unsigned contract dated June 23, 2008" cited in paragraph 5 of the Verified Complaint.  Whether this document exists, or whether the date is another typographical error, is unclear.  Plaintiff has submitted an unsigned contract dated June 20, 2008 (Davies Decl., Ex. 9), but that draft also refers to an FOBT price.  This document also provides that New York law will govern and that disputes will be resolved through binding arbitration in New York.  (Id.)

[6]  "A CIF (cost, insurance, freight) contract is one where, in consideration for the purchase price, the seller ' is bound to arrange for the carriage of the goods to their agreed destination, for insurance upon them for the benefit of the buyer, and either to pay the cost of the carriage and insurance or allow it on the purchase price.'"  Fed. Ins. Co. v. Great Whitefleet (US) Ltd., 2008 U.S. Dist. LEXIS 58461, at *6 n. 4 (S.D.N.Y. Aug. 1, 2008) (quoting Warner Bros. & Co. v. Israel, 101 F.2d 59, 60 (2d Cir. 1939)).

agreement also contains a number of "Shipping Terms and Discharging Conditions."  For example, this agreement provides that "the seller shall charter a carrying vessel" to transport the coal; shall obtain marine insurance; shall nominate a vessel at least thirty days before the latest shipment date for the buyer's acceptance or rejection; and shall nominate one or more safe berths for loading.  (Id., ¶¶ 9.8, 9.2, 9.3, 9.12)  The September 8, 2008 agreement also sets standards for the "carrying vessel" – e.g., not more than 20 years old and ISM certified and compliant – and obligates Plaintiff to "provide full particulars of the vessel" to Metinvest International, including name, flag, year of build, deadweight, draft, number and size of holds.  (Id., ¶¶ 9.8, 9.10)  Finally, the September 8, 2008 agreement contains a number of terms relating to demurrage,[7] including the following:  "If the Buyer fails to discharge the vessel at the rate agreed the Buyer shall pay demurrage at the rate as per charter party."[8]  (Id., ¶ 9.21)

The September 8 agreement – at least in the form provided to the Court – contains no governing law provision and no provision for arbitration in London.  It does contain an integration clause:  "This contract contains the entire agreement between the parties with respect to the subject matter hereof and all proposals, negotiations and representations with reference thereof are merged herein."  (Id., ¶ 14).  It is undisputed that the September 8, 2008 agreement was never signed by either side.  (Mar. 11 Tr. 8)  Plaintiff nevertheless contends that the September 8, 2008 unsigned agreement constitutes a binding contract between itself and Metinvest International.  (Pltf. Br. 6-8)

---

[7]  "Demurrage" generally refers to a fee paid by the charterer to the ship owner when the latter's ship is detained beyond the specified date agreed to in the charter party contract. This situation typically arises when the charterer fails to load or unload cargo within the agreed time.  See Black's Law Dictionary 465 (8th ed. 2004).

[8]  A "charter party" is a written contract between a ship owner and a charterer whereby a ship is hired.

Plaintiff contends that Defendants repudiated the contract to purchase the coal "after the Plaintiff [had] entered into a charter party for the ocean transport of the coal, as it was obligated to do under its contract with the Defendants." (Id. at 8) (emphasis in original)  Plaintiff further contends that "Defendants were aware that Plaintiff would charter a vessel to perform its contract with them as that contract contained [this] requirement[]," and that accordingly Defendants are liable for the $2.15 million in deadfreight losses sustained by Plaintiff, who had to pay the vessel's owner. (Id. at 8-9)

Defendants argue that the attachment order must be vacated for a variety of reasons.  First, Defendants note that the order was issued on the basis of documents that were misrepresented in the Verified Complaint:  the June 30, 2008 confirmation makes no mention of Metinvest International; provides for a FOBT price; and does not provide for a "London Arbitration with English law to apply," as is alleged in the Verified Complaint (at ¶ 11).  (Def. Br. 5-6)  Defendants also argue that this Court should ignore Plaintiff's submissions concerning the alleged September 8, 2008 contract, because that contract was not cited in the Verified Complaint.  (Def. Rply. Br. 9)  Finally, Defendants contend that Plaintiff has not made out a valid prima facie maritime claim, because the alleged agreement to sell and purchase coal is a sale of goods contract and is not maritime in nature, and does not contain any relevant, severable maritime provisions.  (Def. Br. 9-18; Def. Reply Br. 3-9)

## DISCUSSION

The December 23, 2008 attachment order must be vacated for multiple reasons. First, as a result of Defendants' motion to vacate, it has become clear that the order was issued on the basis of misrepresentations concerning the documents constituting the alleged contract between the parties.  Although the Verified Complaint relies on an alleged unsigned contract

dated June 23, 2008, there is no evidence that this document exists. To the extent that a draft contract exists from the late June period, it does not contain the terms that the Verified Complaint alleges: it does not make Plaintiff responsible for shipping the coal and does not provide for a London arbitration. Similarly, the June 30, 2008 signed trade confirmation does not reference Metinvest International – the entity whose funds have been restrained – does not make Plaintiff responsible for shipping, and makes no mention of London arbitration. In sum, these documents provide no basis for this Court to maintain an attachment order, as Plaintiff conceded at the March 11, 2009 hearing. (Mar. 11 Tr. 30) Accordingly, vacatur of the attachment order is appropriate on this ground alone. See also Maersk, Inc. v. Neewra, Inc., 443 F. Supp. 2d 519, 528 (S.D.N.Y. 2006) (because attachment is an equitable remedy, a district court has "inherent authority to vacate an attachment 'upon a showing of "any improper practice" or a "manifest want of equity on the part of plaintiff"'") (quoting Blake Mar, Inc. v. Petrom S.A., No. 05 Civ. 8033 (PAC), 2005 WL 2875335, at *2 (S.D.N.Y. Oct. 31, 2005) (quotations and citations omitted).[9]

---

[9]  As this Court has repeatedly had occasion to state in the context of maritime attachment actions, counsel proceeding on an ex parte basis have a special obligation to ensure that the representations they are making to the Court, and the facts they are verifying in a verified complaint, are true. Centauri Shipping Ltd. v. Western Bulk Carriers, KS, 528 F. Supp. 2d 197, 201 (S.D.N.Y. 2007) ("'[a]ttorneys are officers of the Court, and our system of justice cannot operate efficiently' if the Court is unable to rely on counsel in an ex parte proceeding to work diligently to ensure the accuracy of his representations to the Court") (quoting Four Star Fin. Servs., LLC v. Commonwealth Mgmt. Assoc., 166 F. Supp. 2d 805, 810 (S.D.N.Y. 2001)); ST Shipping and Transport, Inc. v. Golden Fleece Maritime, Inc., No. 07 Civ. 11147 (SAS), 2008 WL 4178189, at *7 (S.D.N.Y. Sept. 9, 2008) (observing that attorneys' "obligation" to "maintain a duty of honesty in all proceedings . . . is at its apex when the court must rely on the verified submissions of counsel before issuing an order ex parte" and that "[t]he conformance of the extraordinary maritime attachment remedy with the strictures of due process 'is premised on the assurance that plaintiffs and their counsel will act with care and candor'") (quoting Centauri Shipping Ltd., 528 F. Supp. 2d at 203); Transfield ER Cape Ltd. v. STX Pan Ocean Co. Ltd., No. 09 Civ. 1250 (JGK), 2009 WL 691273, at *4 (S.D.N.Y. Mar. 17, 2009) ("In ex parte proceedings such as Rule B attachments, parties have a heightened obligation to bring material facts to the

With respect to the September 8, 2008 alleged contract, Plaintiff has not sought to amend the Verified Complaint to reference this document, which was introduced only in opposition to Defendants' motion to vacate.  It is not properly before this Court.  See, e.g., Grain Traders, Inc. v. Citibank, N.A., 160 F.3d 97, 105 (2d Cir. 1998); A.W. Financial Services, S.A. v. Empire Resources, Inc., No. 07 Civ. 8491 (SHS), 2009 WL 212412, at *3 n.2 (S.D.N.Y. Jan. 29, 2009).  Even if this alleged contract had been properly introduced, as discussed below, it is a sale and purchase of goods contract, with no severable provisions relating to deadfreight. Accordingly, it cannot provide a basis for a valid admiralty claim.

## A.      Standards for Maritime Attachment and Vacatur

The Second Circuit has stated that a maritime attachment should issue where a plaintiff has shown that:

> 1) it has a valid prima facie admiralty claim against the defendant;
>
> 2) the defendant cannot be found within the district;
>
> 3) the defendant's property may be found within the district; and
>
> 4) there is no statutory or maritime law bar to the attachment.

Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 445 (2d Cir. 2006).  Here, Defendants contend that Plaintiff has not demonstrated that it has a valid prima facie admiralty claim against them.

"Whenever property is arrested or attached" pursuant to a Rule B order, Rule E(4)(f) provides that "any person claiming interest in [such property] shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules."  Fed. R. Civ. P. Supp.

---

attention of the Court, even, and indeed, particularly when they are adverse.")  This standard was not met here.

8

AMC R. E(4)(f). "At a Rule E(4)(f) hearing, a defendant may attack "'the complaint, the arrest, the security demanded, or any other alleged deficiency in the proceedings.'" Maersk, Inc, 443 F. Supp. 2d at 527 (quoting Fed. R. Civ. P. Supp. AMC R. E advisory committee notes). "Rule E(4)(f) clearly places the burden on the plaintiff to show that an attachment was properly ordered and complied with the requirements of Rules B and E." Aqua Stoli, 460 F.3d at 445 n.5. "Maritime plaintiffs, however, are not required to prove their case at this stage." SPL Shipping Ltd. v. Gujarat Cheminex Ltd., No. 06 Civ. 15375 (KMK), 2007 WL 831810, at *2 (S.D.N.Y. Mar. 15, 2007). Indeed, "[a] detailed discussion of the merits . . . has little bearing on the motion to vacate, which is decided based on whether a prima facie claim is shown and technical requirements for attachment have been met." Chiquita Int'l Ltd. v. MV Bosse, 518 F. Supp. 2d 589, 597 (S.D.N.Y. 2007) (citing Aqua Stoli, 460 F.3d at 445).

Although the Second Circuit has not articulated the nature of the inquiry that must be conducted to determine whether the plaintiff has made out a "valid prima facie admiralty claim," a number of district courts have reviewed not only the allegations in a complaint but also evidence subsequently offered by the parties on a motion to vacate. See, e.g., Wajilam Exps. (Singapore) Pte., Ltd. v. ATL Shipping Ltd., 475 F. Supp. 2d 275, 279 and n. 5 (S.D.N.Y. 2006); Maersk, Inc., 443 F. Supp. 2d at 527 ("A court may also consider any allegations or evidence offered in the parties' papers or at the post-attachment hearing.").

**B.      The September 8, 2008 Agreement is Not a Maritime Contract**

Plaintiff claims that the September 8, 2008 contract is maritime in nature and gives rise to a maritime claim that is capable of supporting a Rule B attachment. Under 28 U.S.C. § 1333(1), federal district courts have original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction. . . ." In determining whether admiralty jurisdiction exists for

a breach of contract claim, the Second Circuit has directed district courts to "look to the contract's 'nature and character to see whether it has reference to maritime service or maritime transactions.'" Folksamerica Reinsurance Co. v. Clean Water of New York, Inc., 413 F.3d 307, 312 (2d Cir. 2005) (quoting Norfolk S. Ry. Co. v. James Kirby, Pty Ltd., 543 U.S. 14, 24, 125 S. Ct. 385, 393 (2004)) (citation and internal quotation marks omitted).

Admiralty jurisdiction does not arise simply because a contract refers to a ship, or to the transportation of goods by ship.  "In order to be considered maritime, there must be a direct and substantial link between the contract and the operation of the ship, its navigation, or its management afloat, taking into account the needs of the shipping industry, for the very basis of the constitutional grant of admiralty jurisdiction was to ensure a national uniformity of approach to world shipping."  1 Benedict on Admiralty § 182.  "The touchstone of admiralty jurisdiction is whether the services rendered are maritime in nature."  Efko Food Ingredients Ltd. v. Pacific Inter-link SDN BHD, 582 F. Supp. 2d 466, 470 (S.D.N.Y. 2008).

With respect to contracts that are "mixed" – those that contain both maritime and non-maritime obligations – the Second Circuit "has recognized 'two exceptions to the general rule that "mixed" contracts fall outside admiralty jurisdiction.'"  Folksamerica, 413 F.3d at 314 (quoting Transatlantic Marine Claims Agency, Inc v. Ace Shipping Corp., 109 F.3d 105, 109 (2d Cir. 1997)).  One exception applies where "'the claim arises from a breach of maritime obligations that are severable from the non-maritime obligations of the contract.'"  Folksamerica, 413 F.3d at 314 (quoting Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd., 230 F.3d 549, 555 (2d Cir. 2000)).  The second exception (which Plaintiff does not and could not assert here) "allows courts to exercise admiralty jurisdiction where the non-maritime elements

are 'merely incidental' to the maritime ones."  <u>Folksamerica</u>, 413 F.3d at 314 (quoting

<u>Transatlantic Marine Claims Agency</u>, 109 F.3d at 109).

     Here, the subject matter of the September 8, 2008 contract is the sale and

purchase of coking coal.  Neither coal nor its sale relates directly to the operation of a vessel or

its navigation.  While the September 8 alleged contract contains a number of terms concerning

the ocean transportation of the coal, this case is governed by a long line of authority holding that

"a commodity, sale and purchase contract – even if the contract requires [as here] maritime

transport relating to the shipment of the commodity – is not maritime in nature."  <u>Efko Food</u>

<u>Ingredients</u>, 582 F. Supp. 2d at 470 (rejecting argument that contract and breach claim were

maritime in nature "because the defendant was required [by the contract] to charter ships to pack

up and deliver the palm olein [that was the subject of the contract]"); <u>see also</u> <u>Aston Agro-</u>

<u>Industrial AG v. Star Grain Ltd.</u>, 2006 U.S. Dist. LEXIS 91636, at *7 (S.D.N.Y. Dec. 20, 2006)

(". . . the contracts are not maritime contracts because their primary objective was not the

transportation of goods by sea.  Instead, their primary objective was, undoubtedly, the sale of

wheat.  That the wheat was transported on a ship does not make the contracts maritime contracts

. . . ."); <u>Shanghai Sinom Import & Export v. Exfin (India) Mineral Ore Co.</u>, 2006 AMC 2950,

2951 (S.D.N.Y. Oct. 5, 2006) ("a contract for a land-based sale of goods is not maritime merely

because the seller agrees to ship the goods by sea to the buyer"); <u>Lucky-Goldstar, Int'l (America)</u>

<u>Inc. v. Phibro Energy Int'l, Ltd</u>; 958 F.2d 58, 59 (5th Cir. 1992) ("A principal purpose of the

contract was the land-based sale of over a thousand metric tons of toluene.  It is well-established

that such a sale of goods by itself would not be 'maritime' merely because the seller agrees to

ship the goods by sea to the buyer.").

While Plaintiff acknowledges this line of cases, it argues that Defendants repudiated the contract to purchase the coal "after the Plaintiff [had] entered into a charter party for the ocean transport of the coal, as it was obligated to do under its contract with the Defendants." (Pltf. Br. 8) (emphasis in original) Because "Defendants were aware that Plaintiff would charter a vessel to perform its contract with them," Plaintiff argues that Defendants are liable in maritime for the $2.15 million in deadfreight losses sustained by Plaintiff, which had to pay the vessel's owner. (Id. at 8-9) These allegations do not change the outcome, however.

Assuming arguendo that Defendants knew that Plaintiff would charter a vessel to transport the coal,[10] and that Plaintiff was required to do so by the September 8, 2008 contract, this does not change the fact that here, as in Efko, the "primary objective" of the alleged contract was "not to accomplish the transportation of goods by sea." Efko Food Ingredients, 582 F. Supp. 2d at 471. Instead, the "primary objective" of the September 8 agreement was the sale and purchase of coal. Although a sale of goods contract may "specify the manner of delivery ([including that it be] by sea)," such a contract has as its "primary objective the transfer of title to goods – not the means by which they are to be transported." Id.

French Republic v. Fahey, 278 F. 947, 949 (D. Md. 1922) illustrates the principle that a non-maritime purchase and sale agreement does not become a maritime matter simply because defendant's allegedly wrongful conduct causes plaintiff to breach a maritime obligation. In that case, the French Republic contracted to purchase thousands of tons of rye from Baltimore grain dealers. The sellers agreed to deliver the grain to the port of Baltimore by July 31, 1920.

---

[10] Plaintiff's charter party agreement with the ship owner Oldendorff is dated September 2, 2008 (Charter Party, Davies Decl., Ex. 3; Cmplt., ¶ 7), while the agreement that Plaintiff now relies on is dated September 8, 2008. It seems highly improbable that Plaintiff would charter a vessel before entering into an agreement with Defendants that obligated Plaintiff to arrange for transport of the coal.

The buyer was obligated to transport the grain to France and hired a ship to do so.  "In conformity with the terms of the contract," when the ship arrived in Baltimore, the buyer sent word to the sellers that the ship was ready for loading, and told the sellers that they would have to pay demurrage if there was a delay in loading.  The sellers did not deliver the grain by July 31, and as a result there was a substantial delay in loading.  The buyer sued the sellers in an admiralty proceeding for the demurrage.  The sellers argued that there was no admiralty jurisdiction, and the Court agreed.  While acknowledging that the buyer would likely recover damages in an action at law against the sellers, the Court found that there was no jurisdiction in admiralty:

> an original nonmaritime contract of purchase and sale does not become maritime merely because the buyer may be entitled to recover from the seller a sum which it had to pay because the default of the sellers in their nonmaritime undertaking caused it, in its turn, to break a maritime engagement.

Id.

The holding in French Republic describes what allegedly happened here.  The Defendants allegedly repudiated a contract to purchase coal, knowing that Plaintiff had already chartered a vessel to transport the coal.  As a consequence of Defendants' repudiation, Plaintiff was forced "to break a maritime engagement" with Oldendorff, and became liable for deadfreight damages.  It may well be that Plaintiff can seek compensation from Defendants in the form of consequential damages, but such a claim does not lie in admiralty.

Finally, Plaintiff argues that the September 8 agreement is a "mixed" contract that contains both maritime and non-maritime obligations.  As noted earlier, while mixed contracts generally fall outside admiralty jurisdiction, the Second Circuit, in Folksamerica, "recognized 'two exceptions to the general rule.'"  Folksamerica, 413 F.3d at 314 (quoting Transatlantic Marine Claims Agency, 109 F.3d at 109).  Plaintiff argues that the first exception set forth in

Folksamerica – where "'the claim arises from a breach of maritime obligations that are severable from the non-maritime obligations of the contract,'" Folksamerica, 413 F.3d at 314 (quoting Hartford Fire Ins. Co., 230 F.3d at 555) – is applicable here.  Plaintiff claims that the "Defendants have failed to pay Plaintiff's deadfreight claim due and owing under [their] contract with the Plaintiff," that this "maritime obligation of the contract between the parties has been breached," and that this maritime obligation "is severable from the non-maritime obligations of the contract."  (Pltf. Br. 10)

        The principal problem with Plaintiff's argument is that the September 8, 2008 unsigned contract does not address deadfreight.  (Davies Decl., Ex. 2; Mar. 11 Tr. 47)  While the agreement provides that the buyer shall pay demurrage if it fails to unload the vessel at the agreed upon rate, and will likewise be liable for demurrage if it delays departure of the ship once discharge is completed (Davies Decl., Ex. 2, ¶¶ 9.21, 9.22), the contract does not address what allegedly happened here:  repudiation of the contract to purchase the coal before any ship set sail but after Plaintiff had signed a charter party arranging for transportation of the coal.  Plaintiff has not and cannot cite to this Court any provision in the September 8 agreement that addresses deadfreight or any other specific maritime-related provision in the September 8 agreement that Defendants allegedly breached.  Accordingly, the Folksamerica exception concerning severable maritime obligations is not applicable here.

        The cases relied on by Plaintiff are not to the contrary.  Crossbow Cement v. Mohamed Ali Saleh, 2008 U.S. Dist. LEXIS 98319 (S.D.N.Y. Dec. 4, 2008), Centramet Trading S.A. v. Egyptian American Steel Rolling Co., 2007 U.S. Dist. LEXIS 97940 (S.D.N.Y. September 28, 2007), and Noble Resources S.A. v. Sarl Ouest Import, No. 08 Civ. 3587 (GEL) (S.D.N.Y. Aug. 12, 2008), all involve allegations that defendants breached demurrage provisions

of sale and purchase contracts. While "[i]t is well-settled that demurrage clauses are 'maritime' in nature," and courts have found that such clauses are severable from sale and purchase agreements, Crossbow Cement, 2008 U.S. Dist. LEXIS 98319, at*14, *17, as noted above, Plaintiff's claim here is not for demurrage. Noble Resources S.A. v. Yugtranzitservis & Silverstone, No. 08 Civ. 3876 (LAP) (S.D.N.Y. July 23, 2008), is likewise not on point. That case involved allegations that the defendant had breached contractual terms that obligated it to provide a berth for a vessel and to load it on request. Those claims were clearly maritime in nature.

## CONCLUSION

Defendant's motion to vacate is GRANTED, the December 23, 2008 Order of Attachment is hereby VACATED, and the Verified Complaint is DISMISSED.

It is further ORDERED that any restraint of assets or other property authorized by the December 23, 2008 Order is hereby vacated. With respect to assets or property that has been restrained by garnishees pursuant to the December 23, 2008 Order – specifically, the $1 million of Defendant Metinvest International's funds that Deutsche Bank restrained on January 5, 2009, and the $1,695,923.83 of Metinvest International's funds that JPMorgan Chase restrained on January 6, 2009 – by **April 13, 2009,** Plaintiff must serve a copy of this Order on the respective garnishees by the means provided for in the December 23, 2008 Order.

The Clerk of the Court is directed to close this case.

Dated: New York, New York
April 9, 2009

SO ORDERED.

Paul G. Gardephe
United States District Judge